UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————X

OSWALD BONCOEUR,

                                        Plaintiff

                                                        COMPLAINT
                                                        <u>JURY TRIAL DEMANDED</u>

—Against—


HAVERSTRAW-STONY
POINT CENTRAL SCHOOL DISTRICT
d/b/a/ NORTH ROCKLAND CENTRAL
SCHOOL DISTRICT, MICHAEL SENNO,
*individually,* and ROSE SIRA*, individually,*
*and* ERIC BAIRD*, individually*


                                        Defendants.
———————————————————————————X
OSWALD BONCOEUR, by the Law Offices of Ambrose Wotorson, alleges as follows:

### I.      **INTRODUCTION**

1. OSWALD BONCOEUR (hereinafter, "Plaintiff") whom at all relevant times, has served in the position of Accountant II for Defendants for the past 21 years, has been subjected to discriminatory failures to promote based upon his age, his race, his national origin and prior alienage and his prior protected activities.

2. Plaintiff was also subjected to a hostile work environment, based upon his age, his race, his national origin and prior alienage, and because of his prior protected activities.

3. It is beyond dispute that Plaintiff was satisfactorily performing, on a full-time basis at the times of the failures to promote him, his being subjected to a hostile work environment and retaliation.

4.  More recently, Plaintiff has been subjected to FMLA Interference and FMLA retaliation, also while performing in a satisfactory manner.

## II.   **PARTIES**

5.  Oswald Boncoeur (hereinafter, "Plaintiff"), at all relevant times, served in the position Accountant II for Defendants for at least 21 years, without any promotion whatsoever. Plaintiff resides in Rockland County, New York, and he brings this action in his own behalf.

6.  Defendants, HAVERSTRAW-STONY POINT CENTRAL SCHOOL DISTRICT d/b/a/ NORTH ROCKLAND CENTRAL SCHOOL DISTRICT (hereinafter, "the School District" or "Defendants") is a county school district. It may sue and be sued, and at all relevant times, it employed Plaintiff in the position of Accountant II.

7.  The School District's Headquarters is located at 65 Chapel Street, Garneville, New York, 10923

8.  Defendant, MICHAEL SENNO, who is being sued in his individual capacity, at all relevant times, served as Assistant Superintendent for Business for Defendants School District, was a final policymaker and decisionmaker with respect to promotions and acted under color of law and pursuant to the School District's practices, customs and policies in creating and/or failing to stop a hostile working environment against Plaintiff, including, but not limited to, interfering with Plaintiff's Family Medical Leave Act ("FMLA") rights.

9.  Defendant,  ROSE SIRA, who is being sued in his individual capacity, at all relevant times, served as the District Treasurer for Defendants School District and was a final policymaker and decisionmaker with respect to promotions and acted under color of

law and/or pursuant to the School District's customs and policies in creating and/or failing to stop a hostile working environment against Plaintiff, including, but not limited to, interfering with Plaintiff's Family Medical Leave Act ("FMLA") rights.

10. Defendant, ERIC BAIRD, whom at all relevant times served as an Assistant Superintendent for Human Resources and Community Relations for the School District, was a final policymaker and decisionmaker with respect to promotions and acted under color of law and pursuant to the School District's practices, customs and policies in creating and/or failing to stop a hostile working environment against Plaintiff, including, but not limited to, interfering with Plaintiff's Family Medical Leave Act ("FMLA") rights.

III.     **JURISDICTION**

11. This Court has jurisdiction over this matter under 42 U.S.C. Sections 1981, 1983 and 2000e. Venue is proper because the acts complained of occurred in this judicial district. Moreover, this action is being brought within 90 days after Plaintiff's receipt of a right to sue letter from the U.S. Equal Opportunity Commission (E.E.O.C).

IV.     **FACTUAL AVERMENTS**

12. Plaintiff (hereinafter, "Plaintiff") re-alleges all of the prior paragraphs above, as if fully stated.

13. Plaintiff was originally hired as an Accountant I on or about September 8, 1999.

14. Plaintiff was promoted to Accountant II in 2003.

15. Plaintiff's performance as an Accountant II has been fully satisfactory at all relevant times, and in all positions that he has served in, as made plain by all of his performance evaluations.

16. Plaintiff is 63 years old and he has been the second oldest employee in Defendants' business office at all relevant times. He has been so-employed for the previous 21 years.

17. As well, he is the only black person in Defendants' business office, and he has been the only person who is not American born, at all relevant times up and until August of 2019.

18. Indeed, all of the Defendants have been engaged in a continuing violation and an uninterrupted pattern of discrimination against Plaintiff because of his age, his race, his national origin and his prior alienage, characterized, in part, by his French/Haitian accent, and because of his protected activities.

19. Defendant school district receives several forms of federal funding each year, including, but not limited to: (a) Individual with Disabilities Education Act, Part B, Sections 611 and 619; (b) Every Student Succeeds Act; (c) Title I, Principal/Teacher Improvement Academic Achievement; (d) Title IIA, Teacher/Principle Training/Recruitment; (e) Title IIIA Immigrant Education; Title IV SSAE; Title IIIA, ELL.

*Background and Practice, Policy and Custom*

20. In 2002, James B. Johnston, who is white and American-born, without any non-American accent, was hired as a higher-paying Assistant Superintendent for Business.

21. Upon his hire, Johnston immediately began subjecting Plaintiff to micro-aggressions that were pervasive, such as, for example, telling Plaintiff that Plaintiff asked too many questions and that he was haughty.

22. In fact, Johnston began sarcastically referring to Plaintiff as the "King," for no justifiable reason, other than Plaintiff's frequently asking question and disagreeing with Johnston professionally on well-settled accountancy principles and because of Plaintiff's race, national origin and prior alienage.

23. Indeed, upon information and belief, Johnston was unaccustomed to a Black professional disagreeing with him on well-settled accountancy principles.

24. On or about March 8, 2010, Johnston and the School District created a higher-paying, but interim district treasurer position, and hired Mike Senno, a white man who is American-born.

25. There were no vacancy announcements, and Plaintiff was neither interviewed nor considered for the position, despite his superior qualifications as an Accountant II.

26. In October 2010, Senno was appointed to a newly-created and higher paying Business Administrator position, without a vacancy announcement.

27. Plaintiff was neither interviewed nor considered for the position, though he would have been interested in such a position, because of his superior qualifications as an Accountant II.

28. Upon information and belief, Plaintiff was not considered for the position, despite his superior qualifications, his race and his national origin and prior alienage, characterized, in part, by his strong French/Haitian accent.

29. In 2014, Senno took over James Johnston's higher-paying Assistant Superintendent for Business position without any vacancy announcement. Plaintiff was neither interviewed nor considered for the position despite his superior qualifications as an Accountant II.

30. Upon information and belief, Plaintiff was not considered for the position, despite his superior qualifications, because of his age, his race and his national origin and prior alienage, characterized, in part, by his strong French/Haitian accent.

31. In July 2014, a competitive and higher-paying position of Supervisor of Fiscal Services/Treasurer became available.

32. Typically, Accountant II's are hired to fill this position.

33. Plaintiff was the only Accountant II in Defendants' business office at the time, but rather than interviewing Plaintiff and considering Plaintiff for this competitive position, Johnston created a non-competitive position for "Treasurer" and hired an external candidate, Michael Ivanoff, who is white and American-born. But, within less than a year, Ivanoff told Plaintiff that he was asked to resign, and did, in fact, later resign.

34. Rosa Sira, an external candidate who is white, American-born, and about 12 -13 years younger than Plaintiff, was hired to replace Ivanoff for the higher paying Treasurer position. As per Defendants' practice, policy and custom, Plaintiff was neither interviewed nor considered for the higher-paying Treasurer position.

35. Upon information and belief, Plaintiff was not considered for the position, despite his superior qualifications, because of his age, his race and his national origin and prior alienage, characterized, in part, by his strong French/Haitian accent

36. Donna Dowen, a white, American-born female who is about 7 – 8 years younger than Plaintiff and who was unable to pass an Accountant I test, was eventually hired in 2015, to the higher-paying Deputy Treasurer position.

37. Donna Dowen's appointment was unannounced, and Plaintiff learned of her appointment by happenstance when Plaintiff noticed that she had begun to signing documents as "Deputy Treasurer," and others began to treat her as his boss.

38. Upon information and belief, Plaintiff was not considered for the position, despite his superior qualifications, because of his age, his race and his national origin and prior alienage, characterized, in part, by his strong French/Haitian accent

*Protected Activities*

39.      In April 2018, Plaintiff made an oral, but formal, Complaint that, unlike everybody else in the Defendants' business office – all of whom were white, American-born, and mostly younger than Plaintiff – that he was not being paid for the considerable overtime that he had been performing.

40. This was essentially a discrimination complaint, and thus, Plaintiff was engaged in protected activity.

41.      While this complaint was eventually resolved, Plaintiff was thereafter subjected to a spate of micro-aggressions after his complaint.

*42.* Indeed, from beginning from late April 2018, after he complained about not receiving appropriate overtime as compared to white, American-born, and mostly younger employees, Plaintiff has been subjected to hostilities which are still ongoing in nature, including, for example, defendant Rose Sira, one of Plaintiff's supervisors, mocked Plaintiff's accent by way of facial gestures and shaking of her head, ultimately resulting in Plaintiff been admitted to Good Samaritan Hospital in Suffern, New York with elevated blood pressure; *subordinate* employees arguing with Plaintiff over work assignment issues; having obligatory meetings with Defendants Mike Senno over

false inter-personnel issues and false counseling memos that Defendants Senno has placed in his Plaintiff's personnel file over claims of insubordination due to professional disagreements with Defendants Rose Sira and Mike Senno on well-settled accountancy principles and matters; and even being subjected on February 11, 2019 to a physical assault by Mike Senno.

43. These microaggressions, together, created a hostile work environment that is pervasive and ongoing, and has occurred because of Plaintiff's age, his race, his national origin and his prior alienage, characterized, in part, by his strong French/Haitian accent, and because of his protected activities.

44. In fact, Plaintiff formally complained in early April 2019, about being physically assaulted by Mike Senno, to Eric Baird, the Assistant Superintendent for Human Resources. At no point did Baird, or anybody else employed directly or indirectly with Defendant School District, intervene or attempt to punish, or attempt to correct, Senno's physical harassment.

45. This assault occurred after Senno summoned Plaintiff to his office, where he and Senno had a heated exchange about his (Plaintiff's) accounting practices.

46. Frustrated, Senno physically pushed Plaintiff out of his office.

47. Upon information and belief, Senno has not physically pushed any similarly-situated employees who were non-black out of his office, nor has he engaged in any similar assaultive misbehavior against any non-white employees at any time prior to February 2019.

48. Moreover, upon information and belief, Senno would not have engaged in any such assaultive behavior against any non-white employees.

49. In late April 2019, Defendants – including Mike Senno and Defendants Baird – caused a negative "counseling memo" to be placed in Plaintiff's personnel file that ordinarily would dissuade other employees from making similar complaints about physically assaultive and racially discriminatory behavior. The counseling memo falsely claimed that Plaintiff had acted inappropriately and unprofessionally in complaining about Senno's misbehavior because he (Plaintiff) had been too upset, loud and unprofessional when complaining about Senno's misbehavior.

50. This counseling memo, upon information and belief, was designed to dissuade Plaintiff from making other complaints and to build a paper-trail for his eventual separation from service.

51. Not satisfied with placing a counseling memo in Plaintiff's personnel file, Defendants went to absurd lengths in further condemning his racial complaint and trying to dissuade Plaintiff against making any other such complaints.

52. Indeed, on May 10, 2019, a law firm hired by defendant School District, wrote directly to Plaintiff, claiming that it had been retained to "investigate" Plaintiff's racial discrimination and assault complaint against Mike Senno.

53. The law firm failed to disclose to Plaintiff that it had a relationship with the Defendant School District that involved receiving a monthly retainer of $7,500 and being permitted to invoice Defendants School District $200 an hour, uncapped, for any special employment matters.

54. Clearly, for financial reasons, said law firm was unable to investigate Plaintiffs claims without bias, and in fact, utterly failed to do so.

55. On May 10, 2019, the law firm wrote to Plaintiff, in a perfunctory and conclusory 3-paged letter, claiming to not have found any evidence of assaultive or discriminatory behavior on Senno's part because: (1) it somehow could not be believed that any heated discussion took between Senno and Plaintiff allegedly because Plaintiff had not previously reported Senno's behavior to anybody (contradicting the counseling memo placed in Plaintiff's personnel file); (2) because Plaintiff "waited" 60 days before complaining, even though the deadline, to the extent any such deadlines even existed, would have been between 180 and 300 days under EEO guidelines; and (3) that the assault, as Plaintiff described, did not constitute discrimination, and thus, was somehow inappropriate for the purpose of his investigation, even if the alleged assault did occur.

56. The law firm letter is so incompetently lopsided and defensive of Defendant School District and Defendant Mike Senno, that it cannot be taken seriously on any level. The tenor, tone and perfunctory nature of the 3-page letter makes it plain that its author was more interested in maintaining his law firm's $7500 a month and capless $200 an hour relationship with Defendant School District than he was with ferreting out any injustice. Indeed, nowhere in the letter is there any evidence that Mike Senno was asked if he had ever assaulted any non-black staff members as Plaintiff complained of in his complaint.

57. Upon information and belief, this ridiculously lopsided law firm letter was also placed in Plaintiff's personnel file to dissuade him from making any further complaints about discrimination.

58. Moreover, the depth of the law firm's investigation will be fair game for subsequent discovery in the instant action, because if was perfunctory and designed to dissuade Plaintiff from filing further complaints.

59. On October 16, 2019, Defendants, through Rose Sira, began a pattern, which became pervasive, and continuing into early October of 2020, of intentionally accusing Plaintiff of failing to do tasks that she knew, or had reason to know, he had already performed, or in other instances, of falsely accusing Plaintiff of failing to do tasks that she knew, or reasonably should have known, were *not* within Plaintiff's work purview.

60. Specifically, Plaintiff had already done ST-3 reports on his own, without help or prodding. Yet, on or about October 16, 2019, Rose Sira instructed Plaintiff to conduct ST-3 accounting reports, which she knew or had reason to know that Plaintiff had already completed. Sira then went into an unnecessary rant about Plaintiff refusing to follow her instructions.

61. On October 30, 2019 Sira sent an email to Plaintiff  summoning Plaintiff to meeting with his union representative to discuss his alleged "insubordination."

62. Plaintiff and his union representatives, and defendant Eric Baird, on November 14, 2019 met about Plaintiff's alleged "insubordination." In the end, Sira was forced to withdraw her "insubordination" charge against Plaintiff.

63. Still, Defendants thereafter exhibited a pattern of email abuse, shrill disagreements, and harassment concerning Plaintiff's work purview, all designed to create a paper trail for later use in justifying Plaintiff's likely separation from his 21 years' worth of service to Defendants.

64. In March 2020, defendant School District made a decision that all essential staff work from home, and that all essential staff would be given lap-tops to work from home,

65. Plaintiff was not given a laptop to work from home, even though he was the only accountant so employed with district at the time.

66. Plaintiff was unable to get his work done without a laptop

67. In late March Plaintiff received an email saying that there was a laptop available for him to "pick up."

68. Mike Senno delivered the laptop to Plaintiff's home on or about March 27, 2020

69. Thereafter Plaintiff endeavored to catch up by working on uncompensated overtime, on work he had fallen behind when he was without a laptop.

70. Yet, on June 23, 2019, Mike Senno sent Plaintiff an email accusing Plaintiff of being "unprofessional" and "insubordinate" merely because Plaintiff asked Senno during a meeting to not forget to tell MIS to put him in a repair queue because his assigned laptop was not working.

71. There was nothing unprofessional or insubordinate about Plaintiff's reasonable request.

72. On or about August 10, 2020 Rose Sira, decided to take control of the workflow, and told Plaintiff not to do any work until she told him to, thereby severely interrupting to the workflow, which Plaintiff would be blamed for. Plaintiff complained to Eric Baird informing him that Sira's order would severely interrupt the work-flow, and that he (Plaintiff) did not want to be blamed for the interruption.

73. On or about September 16, 2020, Plaintiff sent an email to defendant Senno and defendant Sira to have a project that was not under his normal purview, reassigned to

other employees, because he had recently had retina wear and tear laser surgery and retinal detachment surgery prior to that, and he was feeling extreme strain on his eyes.

74. Defendant Senno responded, without engaging in any interactive process with Plaintiff, denying his request for a medical accommodation and also without determining if there was any reasonable medical accommodation available without an undue hardship. Instead, Senno perfunctorily sent Plaintiff to Eric Baird, the Assistant Superintendent for Human Resources.

75. Baird later falsely told Plaintiff that there was nothing that could be done, without even engaging in any interactive process with Plaintiff or his physicians or determining if there was any reasonable accommodation without an undue hardship was even possible.

76. Thus, Defendant unreasonably denied Plaintiff's reasonable request for a medical accommodation.

77. Plaintiff's problems with defendant School District reached a crescendo in October of 2020, when Plaintiff was forced into an emergency psychiatric leave of absence due to anxiety and depression, both of which were proximately caused by Defendants' pervasive and ongoing micro-management and harassment campaigns against Plaintiff.

78. When Plaintiff sought to take an FMLA leave of absence, Defendants sought to make it difficult for him to do so and sought to make it difficult for him to quietly enjoy his leave.

79. For example, on October 2, 2020 after Plaintiff sought to take a leave of absence under the FMLA, Mike Senno sent Plaintiff an email, explicitly and threateningly

stating that he still wanted to speak with Plaintiff about the project he had requested a reasonable accommodation on went he got back.

80. On October 14, 2020, Senno sent Plaintiff another harassing email asking him, generally, if he had any school district records at his home, and if so, he would send a courier to pick up those records. In the same email, he asked for the passwords for certain computer files that he believed plaintiff had.

81. Plaintiff responded that he did not physically have any school district records at home that he did recall any passwords, and that in any event, hard copies of all the material that he had been working on was carefully and transparently left in his desk hutch for the school district's review.

82. On November 6, 2020, Plaintiff's FMLA leave was extended to January 4, 2021

*No Qualified Immunity*

83. Defendants' failures to promote Plaintiff, was the result of the School District's own practices, polices and customs.

84. Moreover, qualified immunity is not available to the individual Defendants herein as prohibitions against discrimination, retaliation and the creation of hostile work environments in government employment are clearly established and well-settled.

*Damages*

85. As a result of Defendants' actions, Plaintiff has been denied promotional opportunities, and he has been denied the salary increases that would have come along with such promotions that he was so denied.

86. Plaintiff has suffered humiliation and extreme mental anguish as a proximate result of Defendants' acts and omissions, including having to treat with mental healthcare

professionals and being prescribed psychotropic medications to treat anxiety and depression, ailments that were proximately caused by Defendants' actions.

87. Plaintiff's good name and reputation have also been damaged as a proximate result of Defendants' actions against Plaintiff.

88. Plaintiff has a not been able to ameliorate his  employment situation despite his good faith efforts to do so.

89. Individual Defendants' acts were in reckless indifference to Plaintiff's rights, and were intentionally discriminatory and retaliatory, entitling Plaintiff to punitive or liquidated damages, where available as against the individual Defendants.

## V.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
(42 U.S.C. Section 1983) – Age Discrimination, Race Discrimination and Prior Protected Activity Retaliation.

90. Plaintiff re-alleges all of the prior paragraphs above, as if fully stated.

91. Defendants by repeatedly passing Plaintiff over for promotion and by creating a hostile work environment account of because of his race, his age and because of Plaintiff's prior protected activities, violated the Equal Protection and Due Process Clauses of the 14th Amendment of the United States Constitution as made actionable by 42 U.S.C. Section 1983.

**SECOND CAUSE OF ACTION** –
(42 U.S.C. Section 1981) – Race Discrimination, Prior Alienage Discrimination and Prior Protected Activity Retaliation.

92. Plaintiff re-alleges all of the prior paragraphs above, as if fully stated.

93. Defendants by repeatedly passing Plaintiff over for promotion and by creating a hostile work environment because of his race, national origin and prior alienage,

characterized, in part, by his French/Haitian accent, and because of Plaintiff's prior

protected activities, violated 42 U.S.C. Section 1981, as made actionable by 42

U.S.C. Section 1983.

**THIRD CAUSE OF ACTION** –
(42 U.S.C. Section 2000e) – Race Discrimination, National Origin Discrimination and
Prior Protected Activity Retaliation.

94. Plaintiff re-alleges all of the prior paragraphs above, as if fully stated.

95. Defendants by repeatedly passing Plaintiff over for promotion and by creating a

hostile work environment because of his race, national origin, characterized, in part,

by his French/Haitian accent, and because of Plaintiff's prior protected activities,

violated 42 U.S.C. Section 2000e.

**FOURTH CAUSE OF ACTION**
(29 U.S.C. § 621 et seq. ) – Age Discrimination

96. Plaintiff re-alleges all of the prior paragraphs above, as if fully stated.

97. Defendants by repeatedly passing Plaintiff over for promotion and by creating a

hostile work environment because of his Age, and because of Plaintiff's prior

protected activities, violated  29 U.S.C. § 621 et seq.

**FIFTH CAUSE OF ACTION** –
(29 U.S.C. § 2615(a)(1)) – FMLA Interference

98. Plaintiff re-alleges all of the prior paragraphs above, as if fully stated.

99. Defendants by repeatedly interfering with Plaintiff's FMLA leave rights violated 29

U.S.C. § 2615(a)(1).

**SIXTH CAUSE OF ACTION**
(29 U.S.C. § 701et seq.) – Rehabilitation Act

100.    Plaintiff re-alleges all of the prior paragraphs above, as if fully stated.

101.    Defendants, who received federal funds at all relevant times, failed to

reasonably accommodate Plaintiff's vision disability, despite his reasonable request for

such an accommodation that limited one or more of his major life functions, including as

seeing. Defendants therefore violated 29 U.S.C. § 701et seq.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court grant judgment to him containing the

following relief:

a. An award of damages for humiliation, mental pain and suffering associated with Defendants' mistreatment of Plaintiff.

b. An award of damages for past and future loss of compensation as a consequence Defendants' mistreatment of Plaintiff.

c. An award of punitive and/or liquidated damages, where available, as against the individual Defendants, as a consequence of their intentional, willful and egregious mistreatment of Plaintiff and/or their reckless disregard for Plaintiff's civil rights.

d. The costs of this action and Plaintiff's reasonable attorney's fees to the fullest extent permitted by law; and

e. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
         December 24, 2020

Respectfully Submitted

_____
*Ambrose W. Wotorson, Jr., Esq.*
Law Offices of Ambrose Wotorson
225 Broadway, 41st Floor
New York, New York 10007
212-884-5985
Loaww1650@aol.com